IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAC COURTE OREILLES BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS; RED CLIFF
BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS; SOKAOGON CHIPPEWA INDIAN
COMMUNITY, MOLE LAKE BAND OF                    OPINION AND ORDER
WISCONSIN; ST. CROIX CHIPPEWA
INDIANS OF WISCONSIN; BAD RIVER                    74-cv-313-bbc
BAND OF THE LAKE SUPERIOR CHIPPEWA
INDIANS; and LAC DU FLAMBEAU BAND
OF LAKE SUPERIOR CHIPPEWA INDIANS,

                    Plaintiffs,

          v.

STATE OF WISCONSIN, WISCONSIN
NATURAL RESOURCES BOARD;
CATHY STEPP; KURT THIEDE;
and TODD SCHALLER,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          This case for relief from judgment under Fed. R. Civ. P. 60(b)(5) is before the court

on remand from the Court of Appeals for the Seventh Circuit.  Plaintiffs Lac Courte Oreilles

Band of Lake Superior Chippewa Indians; Red Cliff Band of Lake Superior Chippewa

Indians; Sokaogan Chippewa Indian Community, Mole Lake Band of Wisconsin; Bad River

Band of The Lake Superior Chippewa Indians; and Lac du Flambeau Band of Lake Superior

Chippewa Indians want to modify the final judgment entered in this litigation in 1991

1

insofar as it bars tribal members from engaging in night deer hunting outside their reservations on public lands and privately-owned managed forest lands in northern Wisconsin.

Plaintiffs' motion for Rule 60(b)(5) relief was denied by this court in earlier proceedings, but the ruling was reversed on appeal. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 769 F.3d 543, 546 (7th Cir. 2014). The court of appeals found that the 1991 judgment forbidding night hunting of deer by tribal members had been rendered obsolete by the passage of time and the state's greater experience with night hunting of deer since 1991. Beginning in the late 1990s, the state had used state employees and private contractors to kill deer at night in many areas of the state to reduce the increase in the deer population and to prevent the spread of chronic wasting disease in deer. The program showed that night hunting was not as risky as it had seemed, as did the record of on-reservation tribal night hunting, which is not subject to state regulation. Accordingly, the court of appeals saw no reason to prohibit the tribes' members from engaging in such hunting within the ceded territory, "given sensible regulations governing such hunting." Id. Defendants' petition for a writ of certiorari was denied by the Supreme Court. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 135 S. Ct. 1842 (2015).

The court of appeals left it to this court to decide on remand whether to invite the parties to submit comparative evidence of the safety of tribal night hunting in Michigan and Minnesota, two of the four states that allow such hunting. (The other two are Oregon and

2

Washington, which differ considerably from Wisconsin in many respects.). It added that if this were done, "[t]he burden of production should be placed on the state, for as the record stands, the evidence presented by the tribes that night hunting for deer in the ceded territory is unlikely to create a serious safety problem provides a compelling reason for vacating the 1991 judgment." Lac Courte Oreilles Band, 769 F.3d at 549.

On remand, defendants have advised the court that it was no longer asking to introduce any evidence from either Michigan or Minnesota of safety problems associated with night hunting, but would focus on the adequacy of plaintiffs' proposed regulatory scheme for night hunting. Dfts.' Proposals, dkt. #398, at 2. However, citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992), defendants contend that plaintiffs should bear the burden of establishing that its night hunting regulations are suitably tailored to the changed circumstances of night hunting. Id. (if party moving for relief under Rule 60(b)(5) establishes that significant change in circumstances warrants revision of decree, movant must show that requested relief is "suitably tailored to the changed circumstances"). Rufo involved a consent decree for institutional reform, not a dispute over Indian treaty rights. It was appropriate in Rufo for the Court to place the burden on the party moving for relief to show that its request was "suitably tailored" to what were alleged to be changed circumstances. In this case, however, it is not plaintiffs' burden to show that their proposed regulations for tribal night hunting on public lands and privately-owned managed forest lands are adequate to protect public safety. Rather, it is defendants' burden to show that plaintiffs' regulations are inadequate for their purpose.

3

This is because it is well established that a state may restrict Indian rights recognized by treaty only if it can show

> "first, that a substantial detriment or hazard to public health or safety exists or is imminent.  Second, . . . that the particular regulation sought to be imposed is necessary to the prevention or amelioration of the public health or safety hazard.  And third, . . . that application of the particular regulation to the tribes is necessary to effectuate the particular public health of safety interest.  Moreover, the state must show that its regulation is the least restrictive alternative available to accomplish its health and safety purposes."

Lac Courte Oreilles Band, 769  F.3d at 546 (quoting Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 668 F. Supp. 1233, 1239 (W.D. Wis. 1987)).

Defendants contend that the court of appeals directed plaintiffs to look to the night hunting regulations adopted in Minnesota and Michigan when drafting their own regulations, "because they might have a bearing on our case." Id. at 548.  Defendants misread the court of appeals' opinion.  The court did not suggest that regulations in other states might bear on the adequacy of plaintiffs' proposed regulations; it said that "it seems reasonable that Minnesota's and Michigan's experience with night hunting of deer by Indians might have a bearing on our case." Id.  In any event, the question for this court is whether plaintiffs' proposed regulations are sufficient in themselves to protect public safety, not whether the tribes should adopt new rules from other states.

One other matter deserves attention.  In arguing for greater restrictions on plaintiffs' hunting opportunities, defendants argue that plaintiffs "have now been granted a right *in addition to* those granted to the general public in Wisconsin."  (Emphasis in original.)  Dfts.'

4

5Br., dkt. #406, at 33. This is a serious misconception, as plaintiffs point out in their reply brief. Dkt. #409, at 4. Plaintiffs' *retained* their hunting rights, including the right to hunt at night, when they ceded thousands of acres of northern Wisconsin to the United States in the early part of the nineteenth century. Their right to hunt deer at night throughout the ceded territory was prohibited in the final judgment entered in 1991 only because I found then that the state defendants had shown such hunting to be a hazard to public safety, that the particular regulation was necessary to prevent the hazard and that it was the least restrictive alternative to the accomplish the safety purpose. Lac Courte Oreilles Band of Lake Superior Chippewa Indians, 740 F. Supp. 1400, 1423 (W.D. Wis. 1990). Now, with the benefit of 24 years of state experience with night hunting, the tribes have been able to show that the prohibition on off-reservation night deer hunting is no longer necessary for public safety purposes, when properly regulated. It remains plaintiffs' right, as well as its responsibility, to promulgate and enforce the regulations; not defendants'. Defendants' role is limited to showing that plaintiffs' regulations are inadequate.

Whether defendants have made that showing is the question I turn to next. Defendants have focused on five areas in which they think plaintiffs' proposed regulations are inadequate to protect public safety: (1) the "adequate backdrop" regulation; (2) notice; (3) pre-scouting; (4) the need for a spotter; and (5) the proposed start date for off-reservation night hunting. I will consider each of these, taking up the issues of notice and pre-scouting together. Before doing so, however, I will discuss the tribes' regulation on hunter safety training, which provides a basis for determining the adequacy of the five

5

disputed regulations.

TRIBAL REGULATIONS

A. Hunter Safety Training

Under the tribes' regulations, any tribal members who wish to hunt deer at night must be at least 16 (or over ten and accompanied by a mentor who meets the requirements of the program) and have taken a two-day advanced tribal hunter safety course of at least 12 hours. Revised Regulations—Amended (Model Code) Tribal Night Hunting Regulations (hereafter Night Hunting Regs.), § 6.20(1), (7), dkt. #405-3. In addition, they must have taken the basic safety course required of all hunters born after January 1, 1977 and passed a marksmanship proficiency examination administered at night. Id. For this examination, tribal members are required to use the weapon they will be using for night hunting and hit 8 out of 10 shots fired within a 6 1/14 inch bull's-eye at a distance of 100 yards. Id.

The core of the safety course was prepared by Chris McGeshick, who has served as both a state conservation warden and a Great Lakes Indian Fish and Wildlife Commission (GFILWC) warden and has held supervisory positions with the state. Defendants do not suggest that the advanced hunter safety course or the marksmanship examinations are inadequate in any respect. No such requirements were imposed on hunters participating in the wolf hunt in 2012.

6

B. <u>Adequate Backstop</u>

In their Night Hunting Regs., § 6.01, dkt. #405-3, plaintiffs define an "Adequate Backdrop" as meaning "a condition upon which a hunter should know that their discharged bullets will fall harmless" and they set the maximum distance from such a backstop as 125 yards from the member's established stationary position.  Plaintiffs maintain that it is implicit that only an earthen backstop is an "adequate backstop."  They add that their regulations are based on the definition of "adequate backstop" provided them by the state's experts prior to the hearings in this case and that the definition will be enforced because every shooting plan must be approved in advance by a GLIFWC warden or a tribal conservation officer.

Although plaintiffs deny that any additional definition need be provided, they have said that they are willing to modify the definition of "Adequate Backstop" to meet defendants' objections.  They propose the following revision, which includes defendants' preferred wording:

> "Adequate Backstop" means earthen terrain that will stop discharged projectiles under hunting circumstances, considering a reasonable margin of error.  The maximum distance that an adequate backstop should be from the member's established stationary position at night is one-hundred-twenty-five (125) yards pursuant to section 6.20(5) of this ordinance.

Plts.' Reply Br., dkt. #409, at 14.  Adoption of the new proposal will resolve any possible confusion about the meaning of the term, so I will accept plaintiffs' proposed substitute regulation.

Defendants say that even this provision specifically prescribing an earthen backstop

falls short of complete safety.  They argue that tribal members should be required to shoot only from an elevated stand but they have not shown that such a requirement is necessary for safety reasons.  They admit that during the chronic wasting disease eradication program that utilized state employees and some private state contractors, the hunters were not required to shoot only from tree stands.  This was true despite the fact that in many instances the hunters were shooting high powered rifles in areas of the state that were far more heavily populated than those in the ceded territory.  Moreover, the hunters were not required to demonstrate their marksmanship proficiency as the tribal hunters are required to do under the tribal regulations.

Defendants contend that the court should not consider the chronic wasting disease eradication program as relevant because the program differed in multiple ways from the proposed tribal hunting, but the court of appeals explained persuasively why defendants are wrong about the relevance of the program.  It pointed out that, by the Department of Natural Resources' own evaluation, many of the shooters in the program were "ill-prepared," not knowledgeable of the basic rules of firearm safety" and "not seasoned shooters, whereas the tribal hunters are experienced and required to pass a marksmanship test at night." Lac Courte Oreilles Band, 769 F.3d at 546-47.

If the state did not think it was necessary for the  ill-prepared and inexperienced state employees participating in the chronic wasting disease eradication program to shoot only from tree stands for safety reasons, it has no ground for imposing a similar requirement on tribal hunters.  Moreover, the existence of an earthen backstop is sufficient to prevent high

caliber bullets from traveling outside the hunting area, thus achieving the same purpose defendants have in mind when they propose a regulation that would require tribal night hunters to shoot only from elevated stands.

## C. Notice and Pre-Scouting

Defendants contend that, for safety reasons, any tribal member wishing to hunt at night should be required to pre-scout the hunting area at some time after Labor Day, revisit the area within 48 to 24 hours each time before they actually hunt there and give notice of hunting plans to the tribal conservation department.  The department would be required to notify the Wisconsin Department of Natural Resources of each night's planned hunting, so that on any given night law enforcement and members of the public would know which tribal members are hunting and where.  Not surprisingly, plaintiffs oppose the proposals. They do not object to the requirement to scout the area after Labor Day or to prepare a hunting plan in order to obtain a night hunting permit, but they see no safety need to undertake additional inspections of their assigned hunting areas two days in advance each time they plan to hunt or to give public notice in advance of each night's hunting.

At the evidentiary hearing held in 2013, state expert witness Randall Stark, Chief Conservation Warden for the DNR, testified that plaintiffs could decrease the risk of hunting in an area in which there might be backpackers or others using the woods if they required to shine the safe zone of fire upon arriving at their nighttime hunting location.  Tr. trans., 4-A-245, dkt. #366.  Stark also testified that the state had never required nightly

9

notice of hunting during the chronic wasting disease eradication program and does not require it now for hunters of unprotected species.  Tr. trans., 4-A-275-77.  In  response to this suggestion, plaintiffs added a new requirement to their night hunting regulations:  if the hunter arrives during daylight hours, the hunter must "shine the established safe zone of fire and adequate backstop area prior to hunting in order to properly evaluate the hunting location."  Id.  The regulation also prohibits any night deer hunter from hunting between one hour after sunset and one hour before sunrise except with a light.  Tribal Hunting Regs., § 6.20(3)(a).

Stark testified that he believed that tribal hunters should give notification of their hunting areas, but said that he "was not arguing for notification for each night."  Tr. trans., 5-A-77-79; 5-A-58.  Plaintiffs have included in their regulations a requirement that tribal hunters file a signed and certified shooting plan that will be valid between November 1 to the close of the regular deer season, Night Hunting Regs. § 6.20(5), and they have added to their regulations a provision under which they will respond to requests from federal, state and local officials by providing lists of the tribal hunting identification numbers of authorized members and copies of pre-approved shooting plans containing sufficient detail to determine the hunting location.  Id. at § 6.20(8).  These additions are sufficient to meet the safety needs of the public.

Because the state never imposed similar requirements on the shooters it used during the chronic wasting disease eradication program or during the 2012 wolf hunting season and did not see any increase in hunting accidents, defendants have failed to show that any

additional requirements are either non-discriminatory or necessary to ameliorate a substantial risk to public safety.  It is sufficient that, as the tribal regulations require, any prospective night hunters must obtain a permit, obtain pre-approval of the area in which they wish to hunt, visit that location at least once after Labor Day and prepare and submit to tribal authorities a shooting plan that shows the "safe zone of fire," that is, "the area and direction in which a hunter may safely discharge a weapon," Tribal Hunting Regs., § 6.01(11), as well as the locations of certain buildings, roads, lakes and trails, as specified in § 6.20(5)(a).

## D. Spotter

Defendants object to the lack of a requirement in the tribal regulations for a "spotter," that is, "an unarmed individual in exclusive possession of an adequate light who is responsible for assisting a night hunter with target identification, target isolation, and risk mitigation."  Dfts.' Br., dkt. #406, at 25.  They propose that the regulations include a requirement for a spotter unless the hunter is using an elevated tree stand at least ten feet off the ground, utilizing a "single bait pile placed below and within 17 yards of the stationary position," the hunter targets only deer located at the bait pile and the zone of fire does not exceed 50 yards.  Dfts.' Resp. Br., dkt. #406, at 25.

Defendants' proposal suffers from the same problem as their proposal for specifying that tribal hunters shoot only from a tree stand:  no requirement for either an elevated tree stand or a spotter was deemed necessary for most of the time in which state employees

11

participated in the chronic wasting disease eradication program during the years 2002-07. Despite this, the state reported no accidents. Moreover, the state does not require persons hunting unprotected species at night to have a spotter.  Testimony of Randall Stark, tr. trans. 4-A-275-277, dkt. #278.  Requiring plaintiffs to add a spotter to their regulations would be discriminatory and unnecessary for public safety.

### E. Season Start Date

Plaintiffs propose a night deer hunting season to run from November 1 until the first Monday in January, with a break to accommodate the state's regular nine-day deer hunting season.  Defendants object to allowing tribal members to start hunting deer before the end of the nine-day state hunt, although they concede that the period from November 1 until the start of the state hunt is prime deer hunting season.

Defendants have shown no good reason why a shorter tribal deer season is necessary to protect public safety.  Although they assert that a November 1 start will bring hunters into contact with people who are using the woods for other reasons, the evidence at trial showed that few people are in the northern part of Wisconsin in November for recreational purposes. Visitor Use Report for Chequamegon National Forest for 2011; Thannum testimony, 3-A-9-3-A-76, dkt. #365.  Not only is the recreational use of the area greatly reduced by the end of October, id., but plaintiffs' night hunting regulations delay the start of each day's hunting to one hour after sunset and end it one hour before sunrise, decreasing the likelihood of overlap with other persons in the woods.

12

Defendants point out that during the state deer hunt, many hunters are in the woods in advance of the hunt to choose their sites and prepare for the hunt.  Plaintiffs' regulations allow time each day for persons such as these to get out of the woods each evening before tribal night hunting starts and they prohibit tribal members from hunting at night from the night before the nine-day state hunt until the night of the day following the state hunt. Tribal Hunting Regs., § 6.20(1).  Moreover, as noted above, plaintiffs' regulations now require tribal hunters either to arrive at their location during daylight hours or to shine the safe zone of fire if they arrive at the location after dark, id. at § 6.20(3), thus lessening any potential danger to anyone who is in the woods after sunset or before sunrise.


ORDER

IT IS ORDERED that the objections of defendants State of Wisconsin, Wisconsin Natural Resource Board; Cathy Stepp; Kurt Thiede; and Todd Schaller to plaintiffs' regulations for night hunting set out in dkt. #405-3 are DENIED as either discriminatory or unnecessary to prevent or ameliorate any substantial risk posed by tribal night hunting. However, plaintiffs' proposed regulations are modified in one respect:  plaintiffs' revised definition of "Adequate Backstop," as set out in their reply brief, dkt. #409 at 14, is substituted for the present definition of the same term in regulation § 6.01 of plaintiffs' revised regulations.

Further, IT IS ORDERED that the judgment entered in this case on March 19. 1991, is AMENDED by deleting the following paragraph:

Defendants may enforce the prohibition on the shining of deer contained in § NR 13.30(1)(q) until such time as plaintiffs adopt regulations identical in scope and content to § NR 13.30(1)(q).

and inserting the following paragraph:

Defendants may not enforce the prohibition on the shining of deer by tribal members contained in NR 13.30(1)(q); henceforth, such activity is governed by plaintiffs' Revised Regulations — Amended (Model Code); Tribal Night Hunting Regulations, dkt. #405-3, as amended in this order.

The clerk of court is directed to enter this amended judgment and close the case.

Entered this 13th day of October, 2015.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

14